**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 21-CR-78-EGS** |
| | : | |
| | : | |
| **JOHN EARLE SULLIVAN,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO RELEASE SEIZURE ORDER AND FORBID SEIZURES OF OTHER ACCOUNTS

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's "Motion to Release Seizure Order and Forbid Seizures of Other Accounts."   D.E. 25.

The current issue comes to the Court in a specific posture:    A magistrate judge has signed two warrants authorizing seizure of the funds at issue, finding probable cause both (1) that the defendant has committed an offense permitting forfeiture – namely, a violation of 18 U.S.C. § 1512 – and (2) that 'the property at issue has the requisite connection to that crime.    A grand jury has twice found probable cause that the defendant violated § 1512, an offense for which forfeiture is statutorily mandated.    That grand jury has likewise included a Forfeiture Allegation finding probable cause that the funds at issue are forfeitable based on the Superseding Indictment. Meanwhile, Federal Rule of Criminal Procedure 32.2(b)(1)(A) provides no avenue for inquiry into the forfeitability of seized proceeds until "after a verdict," presuming that only then will the Court "determine what property is subject to forfeiture" and "whether the government has established

1

the requisite nexus between the property and the offense."   Fed. R. Crim. P. 32.2(b)(1)(A).

Against that backdrop, the defendant's motion claims a right to a pretrial hearing and cursorily asserts that he "needs the funds in the seized bank account to pay his rent and household necessities" and that the seized funds "are not the product of criminal activity alleged."   D.E. 25 at 4-5.   Those bare-bones assertions do not meet the threshold required for a pretrial hearing, which is generally only appropriate where there is a specific claim that the seizure interferes with the Sixth Amendment right to counsel.   Here, in any event, no financial need has been demonstrated, and there is ample probable cause to believe the seized funds – a portion of the $90,875 in profits that the defendant reaped from selling his video footage from his breach of the U.S. Capitol on January 6, 2021 – are forfeitable proceeds.   The motion should be denied.

## BACKGROUND

### Sullivan's Video of Storming the U.S. Capitol

On January 7, 2021, the defendant, John Earle Sullivan, participated in a voluntary interview with law enforcement in Washington, D.C.   The defendant stated that he was at the U.S. Capitol on January 6, 2021, followed the crowd as it pushed past Capitol Police, and entered the U.S. Capitol Building with others through a broken window.   The defendant stated he was wearing a ballistics vest and gas mask.   The defendant further stated that he had been present at the shooting of a woman by a Capitol Police officer and that he had filmed the incident.   The defendant showed the interviewing agent the footage he had taken, which he stated that he had uploaded to the Internet.[1]

---

1  https://www.youtube.com/watch?v=PfiS8MsfSF4&t=537s.

On January 9, 2021, the defendant provided a link to download his video to law enforcement.

Throughout the video, the defendant's voice can be heard narrating and speaking to other individuals.    At one point, the camera pans to his tactical vest and gas mask.





The video captures the defendant filming at the front of a crowd as they pushed through police barriers on the west side of the U.S. Capitol.    After the crowd broke through the last barricade, and as he and the others approach the Capitol Building, the defendant can be heard saying at various points: "There are so many people. Let's go. This shit is ours! Fuck yeah," "We accomplished this shit. We did this together. Fuck yeah! We are all a part of this history," and "Let's burn this shit down."

3



Later, the defendant's video shows individuals climbing a wall to reach a plaza just outside the Capitol Building entrance.    The defendant can be heard saying, "You guys are fucking savage. Let's go!"    The defendant extends his hand and helps pull up one individual.



The video records the defendant's entrance into the U.S. Capitol building as he climbs through a window from which the glass has been broken out:



The video follows as the defendant roams the Capitol Building with other individuals who unlawfully entered.   At various points, the defendant can be heard saying, "We gotta get this shit burned," "it's our house motherfuckers," and "we are getting this shit."

Several times during the video, the defendant encounters law enforcement officers who are trying to prevent further advancement by those who entered unlawfully.   Shortly after entering, officers try to direct the defendant and others out of an exit, but he tells them, "we're just recording, there's too many people to be acting like this.   Like you're not solving anything.   I'm just recording events, it's not worth it; I'm just trying to record, I'm just filming. No freedom of press?" At other points, the defendant tells the officers to stand down.   Among other things, the defendant can be heard telling officers, "you are putting yourself in harm's way," "the people have spoken," and "there are too many people, you gotta stand down, the people out there that tried to do that shit, they got hurt, I saw it, I'm caring about you."

At one point in the video, the defendant enters an office within the Capitol Building.   The defendant approaches a window and states, "We did this shit.   We took this shit."   The defendant also appears to break a window and says, "I broke it.   My bad, my apologies.   Well they already broke a window, so, you know, I didn't know I hit it that hard.   No one got that on camera."

Later, the defendant can be heard saying, "I am ready bro.   I've been to too many riots. I've been in so many riots."

At another point in the video, the defendant joins a crowd gathered before the main entrance to the House Chamber in the U.S. Capitol.   The defendant can be heard telling other individuals, "there's officers at the door."   The defendant can also be heard saying, "Hey guys, I have a knife. I have a knife.   Let me up."   (Separately, law enforcement was provided with a video from

another individual present at this scene, which captures the defendant holding up the apparent handle of a black knife.)

The defendant's video captures someone in the crowd near the main entrance to the House Chamber describing how people are "getting arrested" by officers.   The defendant can be heard saying, "That's why I'm a photographer.   That's why you gotta have ID… It's ok though, you'll be fine, it's only a little jail time… I do this all the time."



Eventually, individuals in the crowd outside the doors announce that the officers are leaving and "giving us the building."   As the crowd begins to part so the officers can leave, the defendant can be heard saying, "Haul that motherfucker out this bitch."

At another point in the video, the defendant walks down a hallway in the U.S. Capitol with a large group of people.   The defendant pans to a closed door and can be heard saying, "Why don't we go in there."   After someone lunges their body against the door, the defendant can be heard saying, "That's what I'm sayin', break that shit."   Further down the hall, he can be heard saying, "It would be fire if someone had revolutionary music and shit."

The defendant then approaches the doorway to the Speaker's Lobby, a hallway which connects to the House Chamber.   The defendant can be heard on the video saying, "I have a

knife…. Let me through I got a knife, I got a knife, I got a knife." He can also be heard telling

one of the law enforcement officers guarding the doors, "We want you to go home. I'm recording

and there's so many people and they're going to push their way up here. Bro, I've seen people

out there get hurt. I don't want to see you get hurt."



Eventually, the law enforcement officers begin to move to the adjacent wall and individuals

within the crowd move toward the doors. The defendant can be heard yelling after the officers,

"I want you to go home," and then yelling, "Go! Go! Get this shit!" as other members of the

crowd try to break out the glass panes in the door. Shortly thereafter, the video includes footage

of a female getting shot as she tries to climb through a glass pane that has been smashed.

### Sullivan's Selling of His Video Footage

At various times in his statements to law enforcement, the defendant has claimed he was

at the U.S. Capitol only to document and report. In addition, at various times since the events of

January 6, 2021, the defendant has claimed to be a journalist. The defendant admitted to law

enforcement, however, that he has no press credentials and the investigation has not revealed any

connection between the defendant and any journalistic organizations prior to the events of January

6, 2021.

The defendant posted on January 6, 2021, a video from on or about January 5, 2021 in Washington, D.C., in which he states to the camera, "I mean, didn't I kind of make up a background though, on the fly a little bit. I think I made up, uh—what did I say I was?   Oh, yeah, I was just a journalist, but I use that all the time. 'Yeah, I'm just a journalist.   I'm here recording.   I got my camera on my shoulder.'   Literally, I have my big-ass camera on my shoulder right here and I have my gimbal, so it kind of looks like it.   'Yeah, I'm just here recording the situation.   Yeah. Livestreaming.   Look, I have—I have people on my live stream.'   That's why I pulled it back out."

The defendant also said on a livestream video that he posted on or about December 11-13, 2020, "Uh, I don't make money off it so I don't consider myself a journalist. But as far as like reporting stuff like I am now, I'm an activist too, so like it kinda plays hand in hand. But as far as like being a journalist, it would be cool to be one, I don't have anything against it."

On January 6, 2021, however, the defendant was captured in recordings by another individual, shortly after exiting the U.S. Capitol Building, expressing excitement that he captured the shooting of the woman on film.   The defendant stated, "Everybody's gonna want this. Nobody has it. I'm selling it, I could make millions of dollars."   The defendant also spoke to someone on speakerphone, stating, "I brought my megaphone to instigate shit.   I was like, guys we're going inside, we're fucking shit up…. I'm gonna make these Trump supporters f—all this shit up…. But I mean you'll see.   I have it all, I have everything, everything on camera, everything I just told you, and I mean everything.   Trust me when I say my footage is worth like a million of dollars, millions of dollars.   I'm holding on to that shit."

Open-source news reporting, moreover, has detailed how in the days after January 6, 2021, the defendant repeatedly changed the self-description on the homepage of his website.   On January 10, 2021, the defendant changed the description from "Activist. Athlete. Motivational Speaker" to "Activist. Video Journalist. Athlete." over a photograph of himself protesting in tactical gear with an assault rifle outside the Utah state Capitol last summer.   On January 11, 2021, he again updated that text to "Video Journalist.   Activist.   Athlete."   On January 12, 2021, he changed the image to a loop from his video of the U.S. Capitol and further updated the text to just "Video Journalist."[2]

On February 15, 2021, prior to a hearing on pretrial release conditions, the defendant's counsel filed a pleading with the Court attaching "receipts for services documenting defendant's employment."   D.E. 13, at 6.   Specifically, the defendant attached numerous invoices and licensing agreements from various media organizations for the rights to use the defendant's U.S. Capitol footage from January 6, 2021.   D.E. 14.

Based on those pleadings and the government's investigation, the government determined that the defendant received at least $90,875 in payments from at least six companies for the rights to use his video footage of the events at the U.S. Capitol.   $89,875 of the payments went to the defendant's personal bank account ending in 7715.   A $1,000 payment went to a Venmo account ending in 2020 that is registered to the defendant's phone number and former residence and connected to his bank account ending in 7715.

---

[2] https://theintercept.com/2021/01/14/capitol-riot-john-the defendant-ashli-babbitt/

**Procedural History**

On February 3, 2021, a grand jury in the District of Columbia returned an indictment against the defendant charging violations of 18 U.S.C. §§ 1512(c)(2) & 2 (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. §§ 231(a)(3) & 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. §§ 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds) and 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

On April 28, 2021, D.C. Magistrate Judge G. Michael Harvey issued two sealed seizure warrants as to $89,875 in the defendant's bank account ending in 7715 and $1,000 in the Venmo account linked to the defendant's bank account.   *See* 21-SZ-1; 21-SZ-2.   The supporting affidavit alleged probable cause to believe those funds were subject to both civil and criminal forfeiture as property "traceable to" the defendant's obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461. Specifically, the affidavit noted that caselaw has defined "proceeds" broadly "to include any property that would not have been obtained but for the underlying violation of law," and reasoned that the "funds Sullivan obtained by filming and selling footage of the January 6, 2021 Capitol riots … would not have existed but for Sullivan's illegal participation in and encouragement of the riots, property destruction, and violence inside the U.S. Capitol in violation of 18 U.S.C. § 1512(c)."

On April 29, 2021, the warrants were served.   The government seized in total a balance of $62,813.76 from the defendant's bank account ending in 7715.

On May 19, 2021, a grand jury returned a Superseding Indictment that added weapons charges, a false statements charge, and a forfeiture allegation.   The Superseding Indictment charges violations of 18 U.S.C. §§ 1512(c)(2) & 2 (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. §§ 231(a)(3) & 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. §§ 1752(a)(1) and 1752(b)(1)(A) (Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon); 18 U.S.C. §§ 1752(a)(2) and 1752(b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon); 40 U.S.C. § 5104(e)(1)(A)(i) (Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building); and 18 U.S.C. § 1001(a)(2) (False Statement or Representation to an Agency of the United States).   Count One, the lead charge, provides that:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **JOHN EARLE SULLIVAN**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct.

> (Obstruction of an Official Proceeding and Aiding and Abetting, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

D.E. 26 at 2.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, the Superseding Indictment seeks, upon conviction of Count One, forfeiture of "any property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offense alleged."   D.E. 26 at 5.   The Forfeiture Allegation specifies, as property to be sought upon such a conviction,

$89,875 in the defendant's bank account ending in 7715 and $1,000 in the Venmo account ending in 2020 linked to the defendant's bank account.

## LEGAL AUTHORITIES

Title 18, United States Code, Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18 of the U.S. Code])" is "subject to forfeiture to the United States."   The provision thus subjects "proceeds" traceable to violations of specified unlawful activities ("SUAs") to civil forfeiture.   Meanwhile, criminal forfeiture is authorized when 18 U.S.C. § 981(a)(1)(C) is used in conjunction with 28 U.S.C. § 2461(c), which holds that "[i]f the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."

In turn, 18 U.S.C. § 1956(c)(7) – which was cross-referenced in § 981(a)(1)(C) – incorporates as SUAs all predicate offenses under the Racketeer Influenced and Corrupt Organizations ("RICO") statute – that is, "any act or activity constituting an offense listed in section 1961(1) of this title [Title 18] except an act which is indictable under subchapter II of chapter 53 of title 31."

Finally, 18 U.S.C. § 1961(1) sets forth the RICO predicates and expressly includes, among those predicates, 18 U.S.C. § 1512.[3]   Thus, "[b]y application of § 2461(c), *forfeiture of property*

---

[3] There is a limited number of forfeiture allegations paired with § 1512 as the SUA. Section 1512 prohibits (a) killing or assaulting someone with intent to prevent their participation in an official proceeding, (b) intimidating someone to influence their testimony in such a proceeding, (c) corrupting records or obstructing, impeding, or influencing such a proceeding, and (d) harassing or delaying someone's participation in such a proceeding – crimes that do not often generate profits.   Nonetheless, the government has identified at least nine indictments where a § 1512

*is mandated for a violation of 18 U.S.C. § 1512*, since it is a racketeering activity identified in 18 U.S.C. § 1961(1), which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A)." *United States v. Clark*, 165 F. Supp. 3d 1215, 1218 (S.D. Fla. 2016) (emphasis added).

## ARGUMENT

It is well-established that there is a 'strong governmental interest in obtaining full recovery of all forfeitable assets." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631 (1989) (noting that that "strong governmental interest …. overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense"). The Supreme Court has long recognized, accordingly, that the government can properly restrain property before trial as long as there is probable cause to believe the assets are subject to forfeiture. *United States v. Monsanto*, 491 U.S. 600, 615-16 (1989). Where such probable cause exists, a criminal defendant has no right to the restrained property.

The defendant requests a pretrial hearing to challenge a seizure of funds that a magistrate judge deemed forfeitable based on probable cause, and that a grand jury has found probable cause to believe are criminal proceeds, asserting that he needs to pay household necessities and that the funds are not traceable to criminal activity. Neither bare assertion is adequate to warrant a pretrial hearing, and in any event, ample probable cause supports the forfeitability of the funds. This case

---

count was a basis for the forfeiture allegation. *See United States v. Clark,* 4:13-cr-10034 (S.D. Fla.); *United States v. Eury*, 1:20CR38-1 (M.D.N.C.); *United States v. Ford and Prinster*, 3:14-cr-45 (D. Or.); *United States v. Shabazz*, 2:14-cr-20339 (E.D. Mich.); *United States v. Cochran*, 4:14-cr-22-01-HLM (N.D. Ga.); *United States v. Adkins and Meredith*, 1:13cr17-1 (N.D. W. Va.); *United States v. Faulkner*, 3:09-CR-249-D (N.D. Tex.); *United States v. Hollnagel*, 10 CR 195 (N.D. Ill.); *United States v. Bonaventura*, 4:02-cr-40026 (D. Mass.). Congress likewise included some of § 1512's surrounding obstruction-related statutes as SUAs, and forfeiture allegations have also referenced these sister statutes. *E.g.*, *United States v. Fisch*, 2013 WL 5774876 (S.D. Tex. 2013) (§ 1503 as SUA); *United States v. Lustyik*, 2015 WL 1401674 (D. Utah 2015) (same).

crystallizes the overriding purpose of forfeiture – to "help to ensure that crime does not pay." *Kaley v. United States*, 571 U.S. 320, 323 (2014).    Where a criminal defendant profits to the tune of $90,875 from his charged crime – proceeds that, based on the totality of facts and evidence specific to this particular case and this particular defendant, would not have obtained but for the defendant's obstructive acts on January 6, 2021 at the U.S. Capitol – there is a strong governmental interest in taking the profits out of the crime, and removing the financial incentives for such behavior going forward.

I.    **The Defendant's Bare-Bones Assertion that Funds are Needed for Household Expenses Does Not Merit a Pretrial Hearing.**

A.  **A Dearth of Caselaw Supports a Pretrial Hearing Based on a Claimed Need to Pay Household Expenses.**

The defendant's motion states that he "needs the funds in the seized bank account to pay his rent and household necessities."   D.E. 25 at 4-5.[4]   To the extent the motion claims a due process right to a pretrial evidentiary hearing to challenge the seizure based on that bare-bones assertion, it is unsupported by caselaw.   Even setting aside the defendant's deficient showing of need, no decision of the Supreme Court or D.C. Circuit, or by any judge of this Court, has ever required a pretrial evidentiary hearing based on a claimed need to pay household expenses.   *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 421 (D.C. Cir. 2008) (declining to consider "whether

---

[4]  The defendant also notes that he did not receive prior notice of the seizure.   21 U.S.C. § 853(f) permits the government to request a warrant authorizing pretrial seizure of forfeitable property in the "same manner as provided for a search warrant."   Here, a magistrate judge found probable cause to grant the request, and as with search warrants, advance notice is not required given the risk that the property will be moved or dissipated.   The government, moreover, has merely seized, not forfeited, the property.   In any event, the Forfeiture Allegation in the Superseding Indictment fulfills notice under Federal Rule of Criminal Procedure 32.2(a).

the due process rights of the defendants compel such a hearing when the assets are not necessary to obtaining counsel of choice").

The Supreme Court and D.C. Circuit have, however, laid down several strictures that substantially limit the circumstances under which pretrial hearings are merited for movants to test the probable-cause determinations underlying pretrial seizures of property.   In *Kaley v. United States*, the Supreme Court noted that pretrial seizure requires probable cause both "(1) that 'the defendant has committed an offense permitting forfeiture;' and (2) that 'the property at issue has the requisite connection to that crime.'"   571 U.S. at 323-24.   The Court made clear, however, that indicted defendants are not entitled to a pretrial hearing on the first of the two requirements. On this issue – probable cause that the defendant has committed an offense permitting forfeiture – "[t]he grand jury's determination is conclusive."   *Id.* at 322, 331.

As to the second of the two requirements – probable cause that the property at issue has the requisite connection to the crime, namely, traceability – the Supreme Court in *Kaley* declined to opine.   But lower courts have generally permitted pretrial hearings on traceability in circumstances *where the specific claim is that the seizure interferes with the Sixth Amendment right to counsel*.   Even in this Sixth Amendment context, moreover, they have only required such hearings when the defendant has made a sufficient threshold showing to "clearly establish[]" that "access to [seized] assets is necessary for an effective exercise of the Sixth Amendment right to counsel."   *E-Gold*, 521 F.3d at 417, 421; *see, e.g., United States v. Hernandez-Gonzalez*, 2017 WL 2954676, at *5 (S.D. Fla. June 26, 2017), report and recommendation adopted, No. 16-20669-CR, 2017 WL 3446815 (S.D. Fla. Aug. 10, 2017) (finding insufficient threshold showing to warrant hearing, which would have been "limited solely to whether the frozen assets are tainted or

15

not" and not whether there was probable cause for the offense).   These cases have each stressed the uniquely weighty and time-sensitive nature of Sixth Amendment right-to-counsel concerns. Where "[t]he private interest at stake is not merely a defendant's wish to use his property in whatever manner he sees fit," but the "right, under the sixth amendment, to counsel of choice," that right must be addressed before trial, if it is to be addressed at all.   *United States v. Monsanto*, 924 F.2d 1186, 1193 (2d Cir. 1991); *see also E-Gold*, 521 F.3d at 416-19 (emphasizing the "permanen[ce]" of injury in "a trial tainted by the violation of the defendant's Sixth Amendment rights").   The extraordinary nature of the injury – a trial without counsel of choice – is what courts have noted to justify deviation from Rule 32.2's plain-letter provision for only post-conviction review.[5]

In effect, the defendant asks to extend that qualified right to pretrial hearings from the right-to-counsel context to household expenses.   But the Sixth Amendment concerns do not necessarily translate.   Although deferring the forfeiture litigation until after trial through the established procedures in Rule 32.2 surely exerts some economic pressure on a defendant, it does not threaten permanent, irreversible deprivation of his interests akin to a trial without counsel of choice.   *Cf. Sunrise Academy v. United States*, 791 F. Supp. 2d 200, 206 (D.D.C. 2011) (deeming "interest in unfettered use of the assets allegedly belonging to [third parties] during the months preceding [the]

---

5 The Rule 32.2(b) procedures provide the defendant with "a meaningful opportunity to contest the deprivation of his property rights, as due process require[s]."   *United States v. Shakur*, 691 F.3d 979, 988-89 (8th Cir. 2012); *see also United States v. Christensen*, 2012 WL 5354745, at *4 (D. Neb. Oct. 29, 2012).   If a defendant is convicted of the relevant offense, the Court must determine "as soon as practical after a verdict … whether the government has established the requisite nexus between the [specific] property" and the offense.   Fed. R. Crim. P. 32.2(b)(1)(A). The parties may submit "additional evidence or information" to the record.   *Id.* § (b)(1)(B). Either party may request a hearing.   *Id.*   And the parties may suggest revisions or modifications to any preliminary order of forfeiture.   *Id.* § (b)(2)(B).

trial" to be "obviously far less pressing than the right of an accused to counsel of his or her choice," and finding absence of a Sixth Amendment claim to tip the balance against the motion).   The private interest at stake is qualitatively different.

In *United States v. Bikundi*, 125 F. Supp. 3d 178 (D.D.C. 2015), Chief Judge Howell found a pretrial evidentiary hearing on traceability "not warranted" where the defendant claimed a need for the seized funds to pay household expenses.   *Id.* at 190.   Chief Judge Howell did, however, find that the strong threshold showing of financial need by that defendant, coupled with express disclaimers of traceability in the government's affidavit supporting the seizure warrant, warranted a "pretrial judicial review of the [seizure] Affidavit itself."   *Id.*   The defendant, Chief Judge Howell emphasized, had provided extensive "evidence of both his near-term financial obligations and his apparent inability to meet those obligations without release of the seized assets," such that "[t]he Court is not persuaded that the defendant's showing is insufficient to warrant *some* procedural safeguard to reduce 'the risk of erroneous deprivation,'" albeit not a full-fledged hearing.   *Id.* at 187, 190.   And she called the risk of erroneous deprivation "particularly acute" in light of "apparent gaps in the challenged affidavits regarding … traceability."   *Id.* at 190-91. Chief Judge Howell thus conducted her own review of the affidavit, and upon finding certain "gaps" where portions of funds lacked the requisite connection to the crimes, ordered the release of those portions.   *Id.* at 191-95.

Accordingly, there is a dearth of caselaw supporting a pretrial hearing to contest the seizure where, as here, no Sixth Amendment right is at stake and the claimed basis is a need to pay household expenses.   At best – and setting aside the defendant's inadequate threshold showing of need, *see infra* I.B – the defendant's claims merit judicial review of the affidavit supporting the

seizure warrants to review the probable cause for the connection between the property and the crime.

### B.  In Any Event, the Defendant's Threshold Showing of Necessity for the Seized Funds is "Undoubtedly Inadequate."

Whatever the legal merits of extending the Sixth Amendment cases on pretrial hearings to the household expenses context, the defendant has not as a *factual* matter made a sufficient showing to trigger any such hearing.   More than conclusory allegations of a need to pay rent and unspecified household expenses is required as a condition precedent.

As courts have emphasized in the Sixth Amendment context, "[e]very court that has addressed the issue has found that a defendant's merely conclusory allegation that he lacks the funds to retain counsel of choice is insufficient to trigger the *Monsanto* hearing."   *United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011) (collecting cases).   Instead, "the defendant must present some evidence that he will be deprived of counsel of choice if he cannot access the seized assets."   *Id.*; *see also E-Gold,* 521 F.3d at 417, 421 (defendant has right to hearing where "need is clearly established," and where "access to assets is necessary for an effective exercise of the Sixth Amendment right to counsel"); *United States v. Unimex*, Inc., 991 F.2d 546, 551 (9th Cir. 1993) ("To determine whether a hearing is required, the court must decide whether the moving papers filed, including affidavits, are 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'").

The defendant's single-sentence assertion falls short of showings that have previously passed muster.   In *E-Gold*, a defendant demonstrated that he had no assets available to obtain counsel by submitting an affidavit "detailing his status as a potential beneficiary of a trust, his lack of other sources of income, his liquid and non-liquid assets (including cars), his debts (including

credit cards and monthly rent), his wife's income, and his dependents and assets held in the name of the dependents," and another defendant did so with an affidavit showing "his monthly expenses, gross and net income from his law practice, all assets and their values, as well as his other outstanding debts."   *United States v. Edwards*, 856 F. Supp. 2d 42, 45 (D.D.C. 2012) (summarizing facts in *E-Gold*); *see also Bikundi*, 125 F. Supp. 3d at 190 ("Through exhibits and representations … the defendant has presented evidence that he is unable to pay his utility bills, such that he must rely on borrowed funds to do so, and property taxes, such that his home is subject to a tax sale…. Defendant likewise has presented evidence that he is unable to pay for his children's preschool education and has recently lost private insurance coverage.").

The defendant's assertion falls short even of what Judge Kollar-Kotelly deemed "undoubtedly inadequate" in *Edwards*, where the defendant attested in a sworn declaration that "'[b]eyond the money seized, I do not have any available funds to pay Attorney Balarezo's retainer.'"   856 F. Supp. 2d at 45.   Judge Kollar-Kotelly noted that *Emor* had likewise rejected as inadequate a comparatively more detailed declaration by a defendant asserting "that he lacks any income or investments, that his spouse is not employed, that he has six dependents, and that he has only between $22,000 and $50,000 in cash on hand or money in savings or checking accounts."   *Id.*; *cf. Emor*, 794 F. Supp. 2d at 149-50 (concluding that the "bare-bones" declaration left the record "bare of any evidence suggesting that Mr. Emor's defense is endangered by a lack of funds").   As Judge Kollar-Kotelly explained, Edwards "failed to provide any detailed information as to his assets, liabilities, and sources of income," including his "ability to use other assets, liquid and non-liquid, to pay his legal fees."   856 F. Supp. 2d at 45-46.   And Edwards likewise "failed to provide any information regarding funds previously paid to his counsel, and

any additional funds that counsel is requesting in order to proceed to trial in this matter," leaving "simply not enough information in the record for the Court to find Defendant cannot retain counsel without the seized assets." *Id.*; *see also United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (affirming ruling that defendant failed to show need for seized assets where his "bare-bones affidavit" gave no information about whether "other members of his family would fund his defense"); *Hernandez-Gonzalez*, 2017 WL 2954676, at *6–7 ("Complete financial disclosure requires that the Defendant identify his assets, liabilities, sources of income, net worth, whether he has access to financial accounts, and the expected costs of his defense team," and why "his family members … are unable to help pay for defense costs."); *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (defendant must show he has no access to funds "from family and friends").

Here, the defendant has submitted no declaration, financial affidavit, or banking statements.   He has not provided any information about his assets outside his bank account ending in 7715, the only account from which funds were seized.   He has not provided information about his short- or long-term liabilities.   He has not detailed his sources of income, despite being, to the government's understanding, currently employed by his father.   He has not described his ability to use other assets, liquid and non-liquid, to pay basic necessities, including the assistance of family members and friends.   He has not provided information regarding what funds he has recently expended toward household expenses and what any additional funds are requested, nor detailed what the "household expenses" entail.   Such specification is particularly essential where expenditures can dramatically vary, irrespective of necessity, based on a defendant's typical lifestyle.  *Cf. United States v. Egan*, 2010 WL 3000000, at *2 (S.D.N.Y. July 29, 2010) ("The

20

Court does not take lightly a request to release funds allegedly stolen from former customers in order to finance luxuries" such as high-end vehicles or a multimillion-dollar home").

A more fulsome showing is particularly warranted in light of the defendant's Pretrial Services Report from the arresting jurisdiction, which was prepared from an interview conducted on January 15, 2021 and, according to D.C. Pretrial Services, submitted to this Court with the Rule 5 papers.   That document reported significant funds in unspecified bank accounts of the defendant – funds that wholly predate, and lie entirely outside the scope of, the government's seizure warrants.   The government's seizure warrants instead surgically targeted the defendant's $90,875 in proceeds from sales of his video footage from the U.S. Capitol – all of which was deposited into his bank account subsequent to January 15.   The Pretrial Services Report further noted multiple vehicles owned by the defendant.   And it provided a specific estimate of the defendant's monthly expenses to include rent, groceries, cell phone, auto insurance, and other incidentals – which, if extrapolated, should mean that the defendant retains substantial assets notwithstanding the government's seizure of the $62,813.76 on April 29, 2021.

The government, moreover, is aware of at least one other bank account of the defendant with America First Credit Union in which he retained a positive balance as of March 19, 2021. Again, this account and the funds therein lie wholly outside the scope of the government's seizure warrants.

In any event, the defendant bears the burden of persuasion to establish bona fide financial need to use the seized funds to maintain basic and essential household necessities.   The motion's conclusory statements fall well short.

## II.   The Seized Funds Are "Traceable to" and Sufficiently Connected to the Defendant's Obstruction of an Official Proceeding on January 6, 2021.

The defendant's motion additionally asserts that "the proceeds of the seized bank account are not the product of the criminal activity alleged in the indictment."   D.E. 25 at 5.   Magistrate Judge Harvey found otherwise in issuing the two seizure warrants.   The 19-page affidavit on which he relied, moreover, contains no disclaimers of traceability akin to what was identified in *Bikundi.*   Should this Court reach the issue, there is, based on the totality of facts and evidence specific to this particular case and this particular defendant, a strong nexus between these proceeds and the crime.   *See Kaley*, 571 U.S. at 338-39 (probable cause requires only a "fair probability"; it is "not a high bar," and serves "only a gateway function"); *United States v. Brock*, 747 F.2d 761, 763 (D.C. Cir. 1984) ("Circumstantial evidence and inferences therefrom are good grounds for a finding of probable cause in a forfeiture proceeding.").   Regardless of which party bears the burden of persuasion – an apparently unsettled question[6] – the facts of this case readily satisfy probable cause for the requisite connection between the proceeds and the crime.

The governing standard for the causal connection between the forfeitable proceeds and the crime is a "but-for" test.[7]   Under the "but-for" test, which has been expressly adopted by the D.C.

---

[6] *Compare United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (government bears "relatively modest burden"); *with United States v. Kaley*, 579 F.3d 1246, 1257 (11th Cir. 2009) ("defendant, as the movant, would have the burden of proof"); *United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001) (defendant has "opportunity . . . to prove by a preponderance of the evidence that the government seized untainted assets without probable cause"); and *E-Gold*, 521 F.3d at 418 (suggesting that defendant bears the burden of making a "successful showing").

[7] *E.g., United States v. Farkas*, 474 F. App'x 349, 360 (4th Cir. June 20, 2012) ("funds are considered proceeds and therefore deemed forfeitable if 'a person would not have [the funds] but for the criminal offense'"; collecting cases); *United States v. Nicolo*, 597 F.Supp.2d 342, 346 (W.D.N.Y.2009), aff'd, 421 Fed.Appx. 57 (2d Cir. 2011) (same); *United States v. Warshak*, 631 F.3d 266, 329-330 (6th Cir. 2010) (even if a part of the business was legitimate, the proceeds of that part are forfeitable if the legitimate side would not exist but for "fraudulent beginnings" of the operation); *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (health care

Circuit, "'proceeds' means the property that a person would not have obtained or retained but for the commission of the offense."   Stefan D. Cassella, *Asset Forfeiture Law in the United States* (1st ed. 2012), at § 25-4, p. 10 (emphasis added); *see also United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) ("Because the but-for test usefully articulates the requirement of a nexus between the targeted property and the [criminal] activity, we adopt it.").   Here, the relevant proceeds are the $90,875 in profits that the defendant reaped from selling video footage of his participation in the storming of the U.S. Capitol on January 6, 2021.

The facts of this case present compelling evidence that this defendant would not – and could not – have obtained the $90,875 in proceeds *but for* his attempt to "obstruct, influence, and impede [the] proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct" – that is, his violation of Count One.   As recounted in the affidavit, there is evidence that the defendant came to the U.S. Capitol prepared to both film and instigate mayhem; that he exploited his posture of recording to cajole and resist officers inside the Capitol and to make his way to the front lines of confrontation; and that shortly after leaving, he boasted of his intent to make "millions of dollars" from his footage of the "revolution" he had just witnessed and participated in.   There is strong evidence that the defendant was no mere bystander but rather an active participant –wielding a gimbal and recording device alongside his tactical gear – in the siege

---

provider is liable to forfeit funds she received from Medicare and private insurers because she would not have received either but for her fraudulent billings); *United States v. Cekosky*, 171 Fed. Appx. 785 (11th Cir. 2006) (because defendant would not have been able to open his bank account but for having committed an identity theft offense, the interest earned on the deposits represented proceeds of the offense, even though the deposits were made with legitimate funds); *United States v. Horak*, 838 F.2d 1235, 1242-43 (7th Cir. 1987) (originating the but-for test).

that brought Congress's Electoral College vote certification proceeding to a halt.   And it is clear that this was $90,875 in proceeds that the defendant would not have earned but for his obstructive acts on January 6.   Prior to January 6, the defendant had no known connections to journalistic organizations, nor payments by such organizations for his livestreams; indeed, he had admitted just weeks earlier that "I don't make money off it."

The defendant would not have obtained footage inside the Capitol at all had he not unlawfully breached and remained in the building.   More fundamentally, the defendant would not have obtained the footage he got – with the proximity and front-line vantage points he achieved, nor of the length and scope he captured – had he not engaged in the very conduct for which he is being charged in Count One.   The defendant exploited the fact that he was filming in the course of his obstructive acts.   His footage showed him repeatedly invoking how he was "recording" as he resisted and cajoled law enforcement officers to stand down:   At one point, he tells officers trying to usher him and others out of an exit, "we're just recording, there's too many people to be acting like this.   Like you're not solving anything.   I'm just recording events, it's not worth it; I'm just trying to record, I'm just filming.   No freedom of press?"   At another point, he tells someone by the main House Chamber entrance who is describing how others are getting arrested by law enforcement, "That's why I'm a photographer.   That's why you gotta have ID."   By the Speaker's Lobby doors, he tells one of the law enforcement officers guarding that doorway, "We want you to go home.   *I'm recording* and there's so many people and they're going to push their way up here."   Moreover, the defendant evidently has his gimbal and recording device in hand as he successfully winds his way to the front of multiple mobs ("Let me through") throughout the building.   In short, the defendant's very actions underlying his § 1512 charge positioned him

to get the footage he got, and the footage itself is inculpatory of that very crime.

Meanwhile, the commercial value of his footage was substantially the result of his proximity as a front-line participant in the storming of the Capitol, including in the aggressive onslaught on the Speaker's Lobby doors that culminated in the shooting.   One of his licensing agreements specifically describes the footage as an "Eyewitness video of the shooting."   D.E. 14 at 2.

Beyond that, the defendant's statements before, during, and after the Capitol attack support the inference that he sought to encourage mayhem and capture it on film.     The affidavit recounts a video in which the defendant, on January 6, said to a friend shortly after he exits the Capitol, "I brought my megaphone to instigate shit.   I was like, guys we're going inside, we're fucking shit up. … I'm gonna make these Trump supporters f-- all this shit up…. But I mean you'll see.   I have it all, I have everything, everything on camera."

The defendant also posted a livestream on social media on or about January 4, 2021, in which he announced that he was in "DC for the January 6 protests, it's going to be massively insane… Trump people?   Damn. Damn.   If it's a mixture of Trump people and Black Lives Matter people, damn, *that's even more intense for me, that's something I want to see.   I'll be a part of it, sure*, I'll be in it, but I don't do illegal stuff guys.   John's a peaceful protester, *I just record and show you guys the world*."   In that same video, the defendant stated, "Yeah I record the popo all the time, and guess what, guess what my lady, I got this nice new camera that shoots very high quality video, and I have a gimbal for that too, so you're gonna have steady shots.   That being said I'll be uploading to Twitter."

As noted, moreover, the defendant boasted at least twice upon leaving the Capitol on January 6 that he would make "millions of dollars" from his footage.   That the defendant was immediately thinking about cashing in supports an inference that he recognized on January 6 that the more disorder he captured around him, the better footage, and more money, he stood to get.

It bears mention that although this defendant's proceeds happen to pertain to video footage and to entail transactions with media organizations, the government's theory of forfeiture is content-neutral and serves content-neutral purposes.   *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'").   The seizure warrant and Forfeiture Allegation rely on the ordinary legal mechanism for civil forfeiture, which authorizes forfeiting "proceeds" of crimes wholly irrespective of their expressive or non-expressive nature.[8] That mechanism could equally apply to, for instance, proceeds from a hypothetical riot shield wrestled from a Capitol Police officer and then auctioned off on eBay, or the sale of information from a Representative's stolen laptop, for $90,875 in profits – factual scenarios not present here. The mechanism is not being deployed because of disagreement with the video's content or message; indeed, it has no bearing on the continued distribution of that video at all.   The seizure imposes no prior restraint on the defendant's ability to engage in expressive activities; it simply seeks to head off any dissipation of proceeds that, by but-for causation, were traceable to his

---

[8]  The seizure thus does not implicate any "Son of Sam" law – content-based laws that specifically targeted proceeds from speech about crimes because of disagreement with its message, and have been disfavored since *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board, et al.*, 502 U.S. 105 (1991).   The Supreme Court itself has emphasized that First Amendment concerns are misplaced where the forfeiture statute is "oblivious to the expressive or nonexpressive nature of the assets forfeited."   *Alexander v. United States*, 509 U.S. 544, 551 (1993).

violation of Count One.

In sum, should this Court reach the issue, there is ample probable cause supporting the traceability of the defendant's proceeds to the crime.   By targeting the defendant's $90,875 in gross profits, this case encapsulates the core purpose of forfeiture – to "help to ensure that crime does not pay."   *Kaley*, 571 U.S. at 323.   Where an indicted criminal defendant is enriched by profits that he would not have obtained but for his charged crime, there is a strong governmental interest in seizing those allegedly ill-gotten gains, and in ultimately removing the financial incentives for this behavior.   Seizure of this defendant's profits from his obstructive acts on January 6 reflects a straightforward attempt to remove the profits from the crime.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court deny the Defendant's motion to release seizure order and forbid seizure of other accounts pending trial and deny a pretrial evidentiary hearing at this time.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

by:                                        Candice C. Wong
                                            D.C. Bar No. 990903
                                            Assistant United States Attorney
                                            555 4th Street, N.W., room 4816
                                            Washington, D.C. 20530
                                            (202) 252-7849
                                            Candice.wong@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2021, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

Candice C. Wong
Assistant United States Attorney